UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PHILIPPE CHERY,
    Plaintiff,


    v.                                CIVIL ACTION NO.
                                       12-12131-GAO

SEARS, ROEBUCK AND
CO., JEFF MERRIFIELD, and
ARMAND MUSTO,
    Defendants.



**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 24)**

**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION TO STRIKE**
**(DOCKET ENTRY # 34)**

**March 9, 2015**

**BOWLER, U.S.M.J.**

    Pending before this court is a motion for summary judgment
(Docket Entry # 24) filed by defendants Sears, Roebuck and Co.
("Sears"), Jeff Merrifield, ("Merrifield") and Armand Musto
("Musto") (collectively "defendants").  Defendants also seek to
strike certain portions of plaintiff's response to their LR.
56.1 statement of undisputed facts and a number of exhibits
plaintiff filed to avoid summary judgment.  (Docket Entry # 34).
Plaintiff Philippe Chery ("plaintiff") opposes both motions.
(Docket Entry ## 28 & 41).  After conducting a hearing on

November 6, 2014, this court took the motions (Docket Entry ##
24 & 34) under advisement.

## PROCEDURAL BACKGROUND

The parties' dispute arises out of plaintiff's employment
with Sears where Merrifield and Musto work as managers.  The
three count complaint sets out the following causes of action:
(1) creation and toleration of a racially motivated hostile work
environment in violation of Massachusetts General Laws chapter
151B ("chapter 151B") (Count I); (2) retaliation for protected
activity under chapter 151B (Count II); and (3) retaliation for
protected activity under the Family and Medical Leave Act
("FMLA"), 29 U.S.C. §§ 2601 et seq. (Count III).  (Docket Entry
# 1).

## STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of
the pleadings and assay the parties' proof in order to determine
whether trial is actually required.'"  Davila v. Corporacion De
Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir.
2007).  It is appropriate "if the movant shows that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).
It is inappropriate "if the record is sufficiently open-ended to
permit a rational factfinder to resolve a material factual

2

dispute in favor of either side." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014). The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor. Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). Where, as here, the nonmovant bears the burden of proof at trial, he "must point to facts memorialized by materials of evidentiary quality and reasonable inferences therefore to forestall the entry of summary judgment." Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014); see Woodward v. Emulex Corp., 714 F.3d 632, 637 (1st Cir. 2013) (as to issues on which nonmovant bears burden of proof, he must "'demonstrate that a trier of fact reasonably could find in his favor'"). "Even in employment discrimination cases 'where elusive concepts such as motive or intent are at issue,' this standard compels summary judgment if the non-moving party 'rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Feliciano De La Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

"Unsupported allegations and speculation do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 39-40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded"). That said, a court "'should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent.'" Adamson v. Walgreens Co., 750 F.3d 73, 83 (1st Cir. 2014).

Defendants submit a LR. 56.1 statement of undisputed facts. Uncontroverted statements of fact in the LR. 56.1 statement comprise part of the summary judgment record. See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed material facts that the plaintiff failed to controvert). Finally, in reviewing a summary judgment motion, a court may examine "all of the record materials on file," Ahmed, 752 F.3d at 495, "including depositions, documents, electronically stored

information, affidavits or declarations . . . or other

materials."  Fed.R.Civ.P. 56(c)(1).

FACTUAL BACKGROUND

I.  <u>Plaintiff's Vocational History with Sears</u>

     The facts in the light most favorable to plaintiff are as
follows.  Plaintiff is a black male from Haiti.  (Docket Entry #
29-86, p. 2).[1]  In January 2008, Sears hired plaintiff as a
customer service associate ("CSA") at its automotive center in
Natick, Massachusetts.  (Docket Entry # 26, pp. 5-7).  As a CSA,
plaintiff received positive feedback on his performance.
(Docket Entry # 29-86, p. 11).  In or about October 2009,
plaintiff was promoted to assistant auto center manager ("AACM")
for the auto center in Saugus, Massachusetts ("Saugus").
(Docket Entry # 29-86, p. 10).  AACMs are responsible for the
direct supervision of CSAs and mechanics and are tasked with
ensuring the day-to-day execution of the selling, service and
support teams to provide fast and effective assistance to each
customer.  (Docket Entry # 26-9, p. 9) (Docket Entry # 26-1, p.
13).

     After working approximately six months as an AACM at Saugus,
plaintiff was given a raise.  (Docket Entry # 29-6).  In
September 2010, plaintiff was transferred to the auto center in

---

     [1]  Page numbers refer to the docketed page numbers rather
than the page numbers in the actual exhibits.

Burlington, Massachusetts ("Burlington") which is one of the
busiest stores in the entire company. (Docket Entry # 26-1, p.
158) (Docket Entry # 29-88, pp. 5-6). As an AACM at Burlington,
plaintiff reported to Merrifield who was the Burlington auto
center manager ("ACM"). Merrifield was initially satisfied with
plaintiff as he was happy with plaintiff's attitude and
motivation. (Docket Entry # 29-89, p. 10). When it came time
for plaintiff's 2010 review, Merrifield rated his work
performance as overall satisfactory. (Docket Entry # 26-1, pp.
18-19).

II. Incidents at Burlington

At Burlington, there was a clique of employees who
exchanged racial remarks which led at least one black employee
to quit. (Docket Entry # 29-93, pp. 2-3). For instance, CSA
Robert Smith ("Smith"), a white male, occasionally called black
employees "brothers" and told others that they were not brothers,
meaning to communicate that they were not black.[2] (Docket Entry

---

[2] The above statements recite the employee's testimony
under oath of what Smith said. Ordinarily, statements in an
affidavit or a deposition "about what he was told" are
disregarded as inadmissible hearsay and cannot be considered on
summary judgment for the truth of the matter asserted. Hannon v.
Beard, 645 F.3d 45, 49 (1st Cir. 2011); see Bhatti v. Trustees of
Boston University, 659 F.3d 64, 71 (1st Cir. 2011) (Bhatti's
recitation of co-workers' out-of-court statements about
scheduling disparities in employment discrimination case is
"inadmissible hearsay"). Accordingly, the above statement is
not considered for the truth of the matter asserted, i.e., that
one is or is not indeed a "brother" or black. See Staniewicz v.

6

# 29-91, pp. 5-9).  On one occasion, Smith said, "What's up,

N[igger]" to other employees and laughed with them in a manner

that was loud enough for the black employee to hear.[3]  (Docket

Entry # 29-93, p. 10).  Smith also imitated stereotypical black

behaviors such as "jive talking."  (Docket Entry # 29-91, pp. 5-

9).  On the first day plaintiff was transferred to Burlington,

he heard John Philbrick ("Philbrick"), a white male, loudly

remark, "Great, we got a black Haitian manager now."[4]  (Docket

Entry # 29-86, p. 43).

## A.    The Philbrick Incident

On or about November 2, 2010, Philbrick called plaintiff a

"'F' nigger" during an argument.  (Docket Entry # 29-86, p. 45).

Jessica Bouley ("Bouley"), who was near them at the time of the

---

Beecham, Inc., 687 F.2d 526, 530 (1st Cir. 1982) ("Appellee
correctly argues that these statements and the notes supporting
them were not hearsay as defined by Fed.R.Evid. 801(c), because
they were not offered for the truth of the matter asserted
therein").  Rather, the statement is considered to show
defendants' tolerance of a discriminatory workplace environment
at Burlington.   See Tuli v. Brigham & Women's Hosp., 656 F.3d 33,
41 (explaining that out-of-court statements not offered for the
truth of the matter asserted but offered to show notice to the
employer and toleration of a general climate of offensive
remarks and displays are admissible).

[3]  For the same reason as the previous footnote, this
statement is not considered for the truth of the matter asserted
but to show defendants' tolerance of a discriminatory workplace
environment.

[4]  Again, this statement is not considered for the truth of
the matter asserted but to show defendants' tolerance of a
discriminatory workplace environment.

incident, produced a written statement which confirmed that
Philbrick called plaintiff a "fxxxing nixxxx." (Docket Entry #
29-13). Plaintiff reported this incident to Merrifield and
asked that Philbrick be terminated as plaintiff did not have the
authority to do so. (Docket Entry # 29-89, p. 25) (Docket Entry
# 26-9, p. 3). Plaintiff also informed Merrifield that he
wished to call 88Sears[5] to report the incident. (Docket Entry #
26-1, p. 54). Merrifield dissuaded plaintiff from pursuing the
matter further and had them shake hands, however, because
Philbrick was the only level four technician at the time—one of
the most valuable mechanics to Sears.[6] (Docket Entry # 29-86, p.
51) (Docket Entry # 29-89, pp. 20-21). After plaintiff reported
the incident with Philbrick to Merrifield, employees who had
worked with Philbrick for many years began to complain about
plaintiff. (Docket Entry # 29-86, pp. 50 & 57) (Docket Entry #
26-9, pp. 51-59).

B.  Remarks by Smith

---

[5]  Sears' fair employment policies prohibit harassment and
discrimination in the workplace. (Docket Entry # 26-9, p. 3).
In an effort to ensure the enforcement of these policies, Sears
maintains a toll free hotline known as "88Sears" that employees
may call to report problems. (Docket Entry # 26-9, p. 3).
Calls placed to 88Sears are directed to a Sears human resources
consultant ("HR Consultant") who may take corrective action if
necessary. (Docket Entry # 26-5, pp. 5-6).

[6]  At the time, there were four levels of technicians:
levels one through four—four being the highest level. A level
four technician was a "master technician" that had a supervisory
role as a mentor. (Docket Entry # 29-89, p. 115).

Meanwhile, Smith continued to make inappropriate remarks to black employees.  When plaintiff brought in a picture of himself playing chess, for example, Smith remarked, "You're lying.  Since when do black people play chess?" (Docket Entry # 26-1, p. 56).  During a conversation between plaintiff and co-workers about the Stanley Cup, Smith interjected, "Why ask him, the only thing black in hockey is the puck." (Docket Entry # 26-1, p. 55).  On another occasion, during a discussion about a natural disaster in Haiti, Smith commented, "Those niggers are under rubble."[7] (Docket Entry # 29-87, p. 21).  Furthermore, when plaintiff noticed that he was repeatedly losing his paperwork, a co-worker told him that Smith regularly "trash[ed] them" every time plaintiff turned around.[8] (Docket Entry # 29-87, p. 2).

---

[7] Smith's statements about plaintiff playing chess, the hockey puck and the disaster in Haiti are not considered for the truth of the matter asserted.  Rather, they are considered to show defendants' tolerance of a discriminatory workplace environment.

[8] The co-worker's statement was made while he was an employee of Sears during working hours and concerned a matter within the scope of his employment.  (Docket Entry # 29-87, pp. 2-3).  It is offered against a party, i.e., Sears, as a means to show Smith's animus and to infer his discriminatory animus against plaintiff.  Accordingly, the statement is admissible under Fed.R.Evid. 801(d)(2)(D).  See, e.g., Lechoslaw v. Bank of Am., N.A., 618 F.3d 49, 57 (1st Cir. 2010) ("Federal Rules of Evidence make clear that a statement is not hearsay if the statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship") (internal quotation marks omitted); Woodman v.

Plaintiff brought this issue to Merrifield's attention and demanded action, but Merrifield merely asked Smith whether the allegations were true. (Docket Entry # 29-87, p. 3). When Smith denied the allegations, Merrifield told plaintiff, "All right; so I just did something about it." (Docket Entry # 29-87, p. 3).

III. <u>Plaintiff's Intermittent Leave and Request for Raise</u>

Plaintiff's daughter was born in June 2011. (Docket Entry # 26-1, p. 36). When she was born, she suffered serious health conditions that caused her to remain hospitalized for several months and required extensive care following her discharge. (Docket Entry # 26-1, pp. 35-36). Plaintiff asked Merrifield for flexibility in his schedule to care for his daughter. (Docket Entry # 29-89, p. 33). Merrifield allowed his request. (Docket Entry # 29-86, p. 25).

On November 10, 2011, plaintiff complained to Merrifield about his compensation and asked him to raise the issue with the Burlington district manager Armand Musto ("Musto"). (Docket Entry # 26-13, pp. 2-3). Merrifield advised Musto of his conversation with plaintiff. He also informed Musto that he had been flexible with plaintiff's schedule and that he was suspecting plaintiff of taking advantage of the situation.

---

Haemonetics Corp., 51 F.3d 1087, 1094 (1st Cir. 1995) (discussing Rule 801(d)(2)(D)).

(Docket Entry # 26-2, p. 6). Plaintiff did not always inform Merrifield in advance when he needed to leave early or arrive late. (Docket Entry # 26-1, p. 72-73). Nor were all of his absences from work for the purpose of caring for his daughter. (Docket Entry # 26-1, p. 71). Prior to this conversation, however, Merrifield had never directly approached plaintiff about attendance issues. (Docket Entry # 29-89, p. 34). This was because plaintiff regularly approached Merrifield to ensure that his intermittent leave was acceptable for fear of being written up. (Docket Entry # 29-89, pp. 33-34).

Musto subsequently called John Reid ("Reid")—his predecessor as district manager and the new regional manager—and relayed his discussion with Merrifield. (Docket Entry # 26-6, pp. 5-6). Reid called plaintiff the next day to help resolve the attendance issues identified by Merrifield. (Docket Entry # 26-6, p. 5). During this conversation, plaintiff complained to Reid that Merrifield and other employees that were friends with Merrifield were "racists." (Docket Entry # 29-44). Reid told him that he would open a case with 88Sears to resolve the issue. (Docket Entry # 29-44). There is no evidence that Reid himself attempted to open a case with 88Sears.

IV.  Plaintiff's Complaint with 88Sears

Three days later, on November 14, 2011, plaintiff reported to Tim Broadley ("Broadley"), the manager of the full-line Sears

11

store adjacent to Burlington, that he believed he was being subjected to racial discrimination. (Docket Entry # 26-15). Broadley advised plaintiff to contact 88Sears to report his concerns. (Docket Entry # 26-15). Accordingly, plaintiff contacted 88Sears and complained that he was subject to racial discrimination at Burlington. (Docket Entry # 29-47). When Merrifield learned of the complaint, he relayed the information to Musto. (Docket Entry # 29-97, p. 17). Shortly thereafter, Musto called 88Sears himself and opened a case against plaintiff, reporting that plaintiff has not been working scheduled hours and that some associates at Burlington have been having issues with him. (Docket Entry # 29-49). Employees at Burlington soon found out about the ongoing investigations and remarked in plaintiff's presence, "We're definitely going to win this case against this nigger."[9] (Docket Entry # 26-1, p. 150).

Musto's response to plaintiff's complaint did not comply with Sears' guidelines for conducting investigations of alleged harassment and discrimination. (Docket Entry # 29-95, pp. 2-3). The guidelines require managers to immediately conduct an impartial investigation upon receiving a complaint or becoming aware that discrimination, harassment, retaliation or violence may have occurred. (Docket Entry # 29-50). Managers have an

---

[9] Again, this statement is not considered for the truth of the matter asserted but to show defendants' tolerance of a discriminatory workplace environment.

obligation to investigate even if the complainant insists that the manager not act. (Docket Entry # 29-50). Further, when managers interview employees as part of an investigation, they are warned not to contest the employee's version of the facts or become frustrated by an inarticulate witness. (Docket Entry # 29-50).

Notwithstanding Sears' policy that an investigation be impartial (Docket Entry # 29-50), HR Consultant Judy Millies instructed Musto—who already had concerns about plaintiff's performance—to investigate him. (Docket Entry, # 29-95, p. 6). Musto brought Reid, who shared similar concerns, and interviewed plaintiff. (Docket Entry # 26-9, p. 37). Musto also interviewed Merrifield during which Merrifield admitted that plaintiff had told him about the inappropriate remarks made by Philbrick and Smith. (Docket Entry # 29-56).

V.  Changes in Co-Workers' Behaviors Post-Complaint

Two weeks after plaintiff's complaint with 88Sears, Merrifield scheduled plaintiff to start work at 7:30 a.m. on Tuesdays. (Docket Entry # 29-39). This was despite their previous agreement that plaintiff could start late on Tuesdays due to his daughter's weekly medical appointments. (Docket Entry # 29-86, pp. 32 & 82). When plaintiff approached Merrifield to address the issue, Merrifield explained that it was a mistake. (Docket Entry # 26-1, p. 87). In light of the

mistake, Merrifield did not prevent Plaintiff from arriving late to care for his daughter. (Docket Entry # 26-1, pp. 95-97). Meanwhile, co-workers reported plaintiff for refusing to help with customers, being lax with his managerial responsibilities and sleeping during working hours. (Docket Entry # 26-9, pp. 52-59).

On December 19, 2011, HR Consultants concluded the investigation regarding racial discrimination at Burlington because they were unable to substantiate plaintiff's complaint. (Docket Entry # 29-90, pp. 14-15). They reached this conclusion because "any witness . . . for sure positively said, yes, they heard this." (Docket Entry # 29-90, pp. 53-54). This was despite an interview with Bouley during which she stated that Philbrick "did use the F-word, [and that he] may have used the word F-ing N-igger."[10] (Docket Entry # 29-61).

The next day, December 20, 2011, plaintiff arrived late for work and proceeded straight to the break room to eat breakfast in order to take medication for his bleeding ulcer. (Docket Entry # 26-1, pp. 30-31) (Docket Entry # 29-86, p. 31). He did not have time to eat breakfast because he needed to attend his daughter's medical appointment. (Docket Entry # 29-86, p. 32).

---

[10]  Defendants do not object to consideration of the typed transmission of the interview. (Docket Entry # 29-61). Bouley's recitation of what Philbrick said is not hearsay because his statement is considered to show the toleration of a discriminatory workplace. See Tuli, 656 F.3d at 41.

Knowing that plaintiff proceeded straight to the break room to eat, Merrifield confronted him and immediately contacted Musto. (Docket Entry # 26-1, p. 34). Musto sent plaintiff home for his insubordination to Merrifield during the confrontation and issued a final warning for the inappropriate behavior. (Docket Entry # 26-14, pp. 19-20). The warning did not result in any demotion or loss of pay to plaintiff. (Docket Entry # 26-13, p. 3).

After Musto sent plaintiff home, plaintiff proceeded directly to the Massachusetts Commission Against Discrimination ("MCAD") and filed his initial charge of racial discrimination against Sears, Merrifield, Smith and Philbrick. (Docket Entry # 29-67). The following day, Musto emailed Broadley and Merrifield and coordinated efforts to hold plaintiff accountable for his actions and performance.[11] (Docket Entry # 29-68). Accordingly, Merrifield provided plaintiff with a hand-written list of expectations. It identified "[e]nsur[ing] every vehicle that comes in is audited" as one of the "#1 business priorit[ies]." (Docket Entry # 26-13, p. 15).

VI. Plaintiff's Termination

_____

[11]  The email stated, in relevant part, "We're at the stage where the allegation that [plaintiff] made have [sic] been unfounded and we are now in the mode of holding him accountable for his actions and performance." (Docket Entry # 29-68).

On January 1, 2012, plaintiff was the manager on duty when only one of 22 vehicles that came through Burlington was audited. (Docket Entry # 26-13, p. 17). Merrifield issued plaintiff a written reprimand for refusing to comply with his directive that every vehicle that comes in is audited. (Docket Entry # 29-71). Sears did not produce any record of any other associates or managers at Burlington receiving a written warning regarding audits.

The following day, Merrifield again confronted plaintiff because a CSA informed Merrifield that he observed plaintiff telling a customer that Sears is racist.[12] (Docket Entry # 29-86, p. 80). Plaintiff denied making such a statement and asked Merrifield to call the customer to verify the allegation. Merrifield did not do so. (Docket Entry # 29-89, p. 80). Instead, Merrifield informed Musto and regional human resource manager Brent Trzaskos ("Trzaskos") about the allegation. (Docket Entry # 29-73). Trzaskos became irate and suggested that plaintiff should be terminated for making baseless comments to customers. (Docket Entry # 29-73). Musto concurred. (Docket Entry # 29-73). Musto subsequently expressed his view to 88Sears that plaintiff should be terminated. (Docket Entry # 26-2, p. 11-13). Both Trzaskos and Musto agreed to terminate

---

[12]  Merrifield's recitation of what a CSA told him is not considered for the truth of the matter asserted. Rather, it is considered to show Merrifield's discriminatory animus.

plaintiff without obtaining plaintiff's version of the incident. (Docket Entry # 29-95, pp. 20-21). Sears was not able to substantiate the allegation, however, and plaintiff was not terminated. (Docket Entry # 29-49, p. 9).

Merrifield and Musto continued to have numerous discussions about terminating plaintiff. (Docket Entry # 29-97, p. 10). Meanwhile, plaintiff began to receive reprimands about alignment audits every few days. (Docket Entry # 29-87, pp. 5-6). Merrifield asked Musto about transferring plaintiff. (Docket Entry # 29-77). Musto was against the idea by stating, "I feel we have an established case against [plaintiff] in Burlington and I do not want to allow him a chance to start over again in a new store." (Docket Entry # 29-78).

On July 21, 2012, Burlington experienced a significant problem with its computer system that made employees unable to process customer payments. (Docket Entry # 26-1, pp. 126-127). Plaintiff was the only management-level employee on duty. (Docket Entry # 26-1, p. 127) (Docket Entry # 29-99, pp. 2-3) (Docket Entry # 29-100, p. 35). Per Sears' policy, plaintiff could not return customers' keys until they paid for the service or parts provided. (Docket Entry # 29-99 pp. 4-5). As a result, customers had to wait for more than three hours and became upset. (Docket Entry # 26-1, pp. 129-131). One customer was particularly combative, aggravating the situation by screaming.

(Docket Entry # 26-1, pp. 136, 140-141).  Plaintiff also
screamed at the customer and the entire staff.  (Docket Entry #
26-1, pp. 136, 140-141).  A few days later, a customer submitted
a complaint against plaintiff asserting that he had acted in an
inappropriate, hostile and unprofessional manner.  (Docket Entry
# 26-1, pp. 179-180).  An 88Sears case was opened the next day
to investigate the incident.  (Docket Entry # 26-11, p. 6).
Trzaskos informed Musto and Reid that the investigation can be
concluded "[i]f there's a letter from a customer attesting to
what happened and one more person can support what the letter
says."  (Docket Entry # 29-83).  He further instructed them to
"keep [the investigation] as short and sweet as possible."
(Docket Entry # 29-83).  Meanwhile, a new ACM Sean Lacey
("Lacey") observed and reported incidents where plaintiff acted
inappropriately towards him and other customers.  (Docket Entry
# 26-8).  On August 14, 2012, Sears ultimately elected to
terminate plaintiff's employment based on "an on-going pattern
of inappropriate and unprofessional behavior."[13]  (Docket Entry #
29-82, p. 5).

## DISCUSSION

---

[13]  There was at least one occasion where associates were
not terminated for yelling at customers.  In one instance, a
customer filed a complaint alleging that an associate at
Burlington cursed him and that the store manager hung up on him.
(Docket Entry # 29-84).  Burlington resolved the complaint by
awarding the customer a $50 gift card without any disciplinary
action against the associate.  (Docket Entry # 29-84).

I.  <u>Hostile Work Environment</u>

Plaintiff submits that defendants subjected him to a hostile work environment in violation of chapter 151B.  Chapter 151B provides a cause of action for a hostile work environment based on the cumulative effect of a series of abusive acts though each in isolation might not be actionable in itself.  <u>See</u> <u>Clifton v. Massachusetts Bay Transp. Authy.</u>, 839 N.E.2d 314, 319 n.5 (Mass. 2005).  A hostile work environment under Massachusetts law is one that is "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [such that it] poses a formidable barrier to the full participation of an individual in the workplace."  <u>Cuddyer</u> <u>v. Stop & Shop Supermarket Co.</u>, 750 N.E.2d 928, 937 (Mass. 2001).[14]

Whether the working environment is sufficiently hostile to establish a claim under chapter 151B depends on both an objective and subjective evaluation such that a reasonable person would find it hostile or abusive and that plaintiff in fact did perceive it to be so.  <u>See</u> <u>Thompson</u>, 522 F.3d at 179.

_____

[14]  Although <u>Cuddyer</u> and other cases cited herein concerned hostile work environment claims based on sexual harassment rather than racial discrimination, courts do not distinguish the two.  <u>See</u>, <u>e.g.</u>, <u>Windross v. Vill. Auto. Grp., Inc.</u>, 887 N.E.2d 303, 306-07 (Mass.App.Ct. 2008) (applying the <u>Cuddyer</u> standard to hostile work environment claim based on racial discrimination); <u>Thompson v. Coca-Cola Co.</u>, 522 F.3d 168, 180 (1st Cir. 2008) (same).

There is no quantitative requirement or threshold for the number or frequency of incidents necessary to establish the claim. <u>See</u> <u>Gnerre v. Massachusetts Comm'n Against Discrimination</u>, 524 N.E.2d 84, 88-89 (Mass. 1988); <u>accord</u> <u>Noviello v. City of Boston</u>, 398 F.3d 76, 84 (1st Cir. 2005). Accordingly, determining whether a plaintiff meets this standard entails a fact specific assessment of all the attendant circumstances. <u>See</u> <u>Conto v. Concord Hosp., Inc.</u>, 265 F.3d 79, 81 (1st Cir. 2001).

Finally, a plaintiff must establish "'some basis for employer liability'" to prevail on a hostile work environment claim. <u>Forrest v. Brinker Int'l Payroll Co.</u>, 511 F.3d 225, 228 (1st Cir. 2007).[15] "'A plaintiff must satisfy different standards for establishing employer liability in a hostile work environment case depending on whether the harasser is a supervisor or co-employee of the victim.'" <u>Id.</u> at 230. In order to establish employer liability for harassment by a non-supervisory co-worker, "a plaintiff must demonstrate that the employer 'knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate action.'" <u>Id.</u> "If the offender is a supervisor, the employer

<hr/>

[15] While <u>Forrest</u> was a Title VII case, the Massachusetts Supreme Judicial Court has said that it is "'our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting [chapter] 151B.'" <u>Ponte v. Steelcase Inc.</u>, 741 F.3d 310, 319 n.9 (1st Cir. 2014). Hence, the court in <u>Ponte</u> applied the employer liability requirement to a hostile work environment claim under chapter 151B.

is liable unless it proves the affirmative defense 'that the employer exercised reasonable care to prevent and correct promptly any [discriminatory] behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" White v. New Hampshire Dep't of Corr., 221 F.3d 254, 261 (1st Cir. 2000).

Defendants first argue that the hostile work environment claim is time barred. This argument fails. The first incident of racial discrimination occurred on or about November 2, 2010, when Philbrick called plaintiff a "'F' nigger." (Docket Entry # 29-86, p. 45). It is true that plaintiff did not submit his complaint to MCAD until December 20, 2011—well beyond the statutory limitation period of 300 days as provided by section five of chapter 151B. In appropriate circumstances, however, a party alleging employment discrimination may file suit based on events that fall outside the applicable statutes of limitation under the continuing violation doctrine. See Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination, 808 N.E.2d 257, 266-67 (Mass. 2004). Under this doctrine, a plaintiff may obtain recovery for discriminatory acts that would otherwise be time barred so long as a related act fell within the limitations period. Id. The doctrine does not apply to discrete acts that are independently actionable in and of

themselves as discriminatory.  Ocean Spray, 808 N.E.2d at 268-269.

"The classic example of a continuing violation is a hostile work environment, which 'is composed of a series of separate acts that collectively constitute one unlawful employment practice.'"  Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009) (interpreting chapter 151B and ADA).  The continuing violation doctrine applies in that setting because "hostile work environment claims by their very nature involve repeated conduct," and "a single act of harassment may not be actionable on its own."  Id. (internal brackets omitted).  Thus, "'component' acts of a hostile work environment claim that occur outside the limitations period may be considered for purposes of determining liability."  Tobin, 553 F.3d at 130.

Taking the summary judgment record in the light most favorable to plaintiff, there is ample proof of racial slurs, epithets and other conduct which a reasonable jury could conclude are objectively and subjectively offensive as to create a hostile work environment.  At least one black employee left Sears because of the prevalence of inappropriate racial remarks at Burlington.  (Docket Entry # 29-93, pp. 13-14).  Philbrick called plaintiff a "'F' nigger."  (Docket Entry # 29-86, p. 45). Smith made various inappropriate comments about the hockey puck (Docket Entry # 26-1, p. 55), plaintiff playing chess (Docket

Entry # 26-1, p. 56) and the Haitian victims (Docket Entry # 29-87, p. 21). Smith also regularly misplaced plaintiff's paperwork and disturbed his work. (Docket Entry # 29-87, pp. 2-3). In addition, while Musto was conducting the 88Sears investigation, plaintiff heard some of his co-workers remark, "We're definitely going to win this case against this nigger." (Docket Entry # 26-1, p. 150). Although plaintiff cannot recall the exact time and dates in which these statements were made, at least one falls within the limitations period.[16]

Defendants contend that the alleged incidents of harassment were not part of an ongoing pattern of discrimination. Instead, defendants characterize these incidents as merely sporadic uses of abusive language, race related jokes and occasional teasing which do not rise to the level of an actionable hostile work environment as a matter of law. There is no question, however, that such pervasive use of the term "nigger"—let alone the inappropriate racial remarks—is humiliating and stigmatizing both objectively and subjectively. Indeed, "[i]t is beyond question that the use of the word 'nigger' is highly offensive

---

[16] Because Musto filed a complaint against plaintiff on November 14, 2011, it is safe to presume that the co-workers' statement about winning the case against plaintiff falls within the limitations period. (Docket Entry # 29-49). Plaintiff also believes that Smith made the comment about a natural disaster in Haiti "[p]robably right before [plaintiff] got fired." (Docket Entry # 26-1, p. 152).

and demeaning, evoking a history of racial violence, brutality, and subordination.  This word is 'perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry.'" McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1116 (9th Cir. 2004).

In addition, a reasonable jury could conclude that such a work environment pervasive with inappropriate remarks and racial epithets could lead to disrespect and insubordination among subordinates.  In fact, shortly after the Philbrick incident, employees who had worked with Philbrick for many years began to complain about plaintiff.[17]  (Docket Entry # 29-86, pp. 50 & 57) (Docket Entry # 26-9, pp. 51-59).  Merrifield and Musto's indifference to—or failure to address—plaintiff's complaint would have further exacerbated the situation.  As such, a reasonable jury could conclude that the alleged incidents of harassment constituted a hostile work environment which posed a "formidable barrier to the full participation of [plaintiff] in the workplace." Cuddyer, 750 N.E.2d at 937.  Discriminatory incidents that would otherwise be time barred, such as the Philbrick incident, would therefore fall within the limitations period under the continuing violation doctrine.  See Ocean Spray, 808 N.E.2d at 266-67; Tobin, 553 F.3d at 130.

---

[17]  Within only a month after the Philbrick incident, four employees complained about plaintiff.  (Docket Entry # 26-9, pp. 51-59).

Turning to employer liability, it is evident that there is sufficient evidence in the summary judgment record for a reasonable jury to conclude that defendants knew or should have known of the hostile work environment. Plaintiff reported the incidents with Philbrick and Smith to Merrifield and demanded action. (Docket Entry # 29-87, p. 3) (Docket Entry # 29-89, p. 25). Musto was also aware of plaintiff's complaint to 88Sears regarding racial discrimination at Burlington. (Docket Entry # 29-97, p. 17). Both Merrifield and Musto nevertheless did not comply with Sears' guideline which required managers to immediately conduct an impartial investigation. (Docket Entry # 29-95, pp. 2-3). Merrifield dissuaded plaintiff from escalating the Philbrick incident and barely attempted to investigate his allegation against Smith. Upon learning of plaintiff's complaint, Musto even filed a complaint against plaintiff instead of conducting an impartial investigation. Although 88Sears did conduct an investigation into plaintiff's alleged discrimination, HR Consultants directed and allowed Musto and Reid—who already had concerns about plaintiff's performance—to lead the investigation. (Docket Entry, # 29-95, p. 6). This was in spite of Sears' policy that the investigation be impartial. (Docket Entry # 29-50). Accordingly, a reasonable jury could conclude that defendants knew or should have known of the discrimination and that they "failed to implement prompt and

appropriate action." <u>Forrest</u>, 511 F.3d at 230.  Count I

therefore survives summary judgment.

II.  <u>Retaliation</u>

Plaintiff submits that defendants unlawfully retaliated

against him for engaging in activities that are protected under

chapter 151B and the FMLA.  Where, as here, there is no direct

evidence of retaliation, courts use the familiar burden shifting

framework outlined by the Supreme Court in <u>McDonnell Douglas</u>

<u>Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973), and <u>Texas Dep't of</u>

<u>Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252 (1981).  <u>See</u> <u>Henry v.</u>

<u>United Bank</u>, 686 F.3d 50, 55, 59 (1st Cir. 2012) (applying burden

shifting framework to FMLA and chapter 151B claims).  Under this

framework, the plaintiff bears the initial burden to establish

the elements of a prima facie showing of retaliation.  <u>McDonnell</u>

<u>Douglas</u>, 411 U.S. at 802.  To make a prima facie showing of

retaliation, the plaintiff must show that: (1) he "engaged in

protected conduct"; (2) he "suffered an adverse employment

action"; and (3) "a causal nexus exists between the protected

activity and the adverse action." <u>Ponte</u>, 741 F.3d at 321.[18]

This minimal showing functions to raise an inference of

discrimination.  <u>Burdine</u>, 450 U.S. at 253-54.  The burden of

---

[18] For purposes of the present summary judgment motion,
defendants do not challenge plaintiff's assertion that he
engaged in protected conduct.  (Docket Entry # 25, p. 10).  Thus,
this court will assume that plaintiff satisfied the first
element of his prima facie case.

production then shifts "to the employer to articulate some legitimate, non-discriminatory reason" for the employment action.[19]  McDonnell Douglas, 411 U.S. at 802.  If the defendant succeeds, "'the burden shifts back to the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus.'"  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010) (internal brackets omitted).  On summary judgment, the plaintiff must establish that no reasonable jury could conclude he would have faced the adverse employment actions had he not engaged in protected conduct.  See Velazquez-Perez v. Developers Diversified Realty Corp., 753 F.3d 265, 278 (1st Cir. 2014) ("at trial, Velázquez must show that he would not have been fired had he not complained").

A.   Prima Facie Case

1.   Adverse Employment Action

     Plaintiff submits that defendants' conduct following his intermittent leave to care for his daughter and his complaint with 88Sears and MCAD constitute adverse employment action.

---

[19]   Similarly, plaintiff does not dispute for purposes of the present summary judgment motion that, "Defendants have offered evidence of legitimate reasons for each of its adverse actions for the [c]hapter 151B claim." (Docket Entry # 28, p. 18).  Thus, this court will assume that defendants have met their burden of production with regards to the chapter 151B claim.

Specifically, plaintiff submits that: (1) he received his first written warning at Burlington; (2) he was sent home for insubordination; (3) he was nearly terminated due to an unsubstantiated allegation from his subordinates; and (4) Musto and Merrifield applied increasing scrutiny and changed plaintiff's performance expectations, all within two months after his complaint to 88Sears. Plaintiff further submits that Merrifield changed his schedule notwithstanding their previous agreement and that his intermittent leave to care for his daughter initiated the investigation into his attendance issues which—combined with the incidents following his complaint—ultimately led to his termination.

Adverse actions consist of a defendant's action to not only discharge or expel, but also to "'otherwise discriminate against' the plaintiff." Sensing v. Outback Steakhouse of Florida, LLC, 575 F.3d 145, 160 (1st Cir. 2009). Thus, a plaintiff can satisfy the second element of his prima facie case by raising a genuine issue as to whether defendants "'took . . . adverse employment action against [him],'" other than termination. Id. Such other adverse employment actions may include "'disadvantag[ing] [plaintiff] in respect to salary, grade, or other objective terms and conditions of employment.'" Id.; accord Blackie v. State of Me., 75 F.3d 716, 725 (1st Cir. 1996) (including demotion, reduction in salary and divestment of significant

responsibilities as examples of adverse employment actions);
O'Brien v. Mass. Inst. of Tech., 976 N.E.2d 154, 159
(Mass.App.Ct. 2012) (holding that a reasonable juror could
conclude that the plaintiff's termination as well as verbal and
written warnings he received which constituted in part the
reasons for his termination were all material "adverse actions"
under chapter 151B).  As such, "[d]etermining whether an action
is materially adverse necessarily requires a case-by-case
inquiry."  Blackie, 75 F.3d at 725.

Defendants contend that these actions are not "materially
adverse" because they did not produce an injury or harm.
Defendants point to the fact that the discussion of plaintiff's
attendance issues, written reprimand for audits and sending
plaintiff home for insubordination did not result in any change
in job responsibilities, demotion or loss of pay to plaintiff.
(Docket Entry # 26-13, p. 3).  This argument fails.  Such less
serious infractions could be construed as having materially
disadvantaged—even though the infractions do not themselves
produce a tangible injury or harm to the plaintiff—if they
"ultimately were included among the reasons for imposition of
the sanction of termination."  O'Brien, 976 N.E.2d at 159.  Here,
although the infractions that occurred subsequent to his
complaints and intermittent leave did not themselves produce a
tangible injury or harm to plaintiff, Sears regarded them as "an

29

on-going pattern of inappropriate and unprofessional behavior"
and elected to terminate plaintiff. (Docket Entry # 29-82, p.
5). This is sufficient to satisfy the second element of the
prima facie case.

2. Causal Nexus

Evidence of a very close temporal proximity between the
protected conduct and adverse employment action is sufficient to
satisfy the third element of the prima facie case. Sanchez-
Rodriguez v. AT & T Mobility Puerto Rico, Inc., 673 F.3d 1, 15
(1st Cir. 2012) ("[v]ery close temporal proximity between
protected activity and an adverse employment action can satisfy
a plaintiff's burden of showing causal connection") (internal
quotation marks omitted); Collazo, 617 F.3d at 49-50. Here,
plaintiff's termination did not occur until August 2012. His
termination therefore did not occur in the immediate aftermath
of defendants' learning of plaintiff's intermittent leave or
complaints with 88Sears and MCAD which he filed on November 14,
2011 (Docket Entry # 29-47) and December 20, 2011 (Docket Entry
# 29-67), respectively.

Temporal proximity, however, is not a determinative factor
in the causal link if there is "'additional evidence beyond
temporal proximity to establish causation.'" Mole v. Univ. of
Mass., 814 N.E.2d 329, 341 (Mass. 2004); accord Garayalde-Rijos
v. Municipality of Carolina, 747 F.3d 15, 25 (1st Cir. 2014)

("'temporal proximity' is merely one factor relevant to
causation"). Thus, "a series of retaliatory measures starting
shortly after the protected activity can justify the inference
that a particular action in that series, although occurring a
considerable time later, is still motivated by retaliation." Id.

As mentioned above, plaintiff proffers a series of events
occurring shortly after his intermittent leave and his
complaints which led up to his termination. Accordingly, a
reasonable jury could conclude that plaintiff's termination was
"still motivated by retaliation" although it occurred "a
considerable time" after the series of events. Id.

In order to establish causal nexus, plaintiff must also
show that the retaliator knew about the protected activity. See
Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013)
("employee must show that the retaliator knew about her
protected activity—after all, one cannot have been motivated to
retaliate by something he was unaware of"); see also Pearson,
723 F.3d at 42 (recognizing that "[k]nowledge alone cannot
provide the causal link" and affirming summary judgment in
chapter 151B retaliation case based on third element); Mesnick v.
Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) ("GE knew, at
the time Mesnick was dismissed, that he was pursuing an age
discrimination claim" but such knowledge, "without more, cannot
itself be sufficient to take a retaliation case to the jury").

Plaintiff easily satisfies this burden because the summary judgment record clearly demonstrates that defendants knew of plaintiff's intermittent leaves and complaints with 88Sears and MCAD before they engaged in the series of events mentioned above. (Docket Entry # 29-97, p. 17) (Docket Entry # 26-2, p. 6). Plaintiff therefore satisfies the third element of the prima facie case. The burden now shifts to defendants to articulate a legitimate non-discriminatory reason for the employment actions.

B. Legitimate Non-discriminatory Reasons for Employment Actions

As mentioned previously, plaintiff does not dispute for purposes of this motion that, "Defendants have offered evidence of legitimate reasons for each of its adverse actions for the [c]hapter 151B claim." (Docket Entry # 28, p. 18). Thus, this court need only determine whether defendants can articulate legitimate non-discriminatory reasons for the employment actions with regards to the FMLA claim. Defendants easily articulate such reasons. When Merrifield first raised plaintiff's attendance issues with Musto, it was not unreasonable for him to do so because plaintiff did not always inform Merrifield in advance when he needed to leave early or arrive late. (Docket Entry # 26-1, p. 72-73). Plaintiff also admitted that not all of his absences from work were for the purpose of caring for his daughter. (Docket Entry # 26-1, p. 71).

As for plaintiff's claim that defendants altered plaintiff's work schedule to create additional conflicts in caring for his daughter, Merrifield explained to him that it was a mistake and did not prevent plaintiff from arriving late to care for his daughter due to the mistake in scheduling. (Docket Entry # 26-1, pp. 87, 95-97). In light of the foregoing, defendants succeed in articulating legitimate non-discriminatory reasons for the employment actions. The burden therefore reverts to plaintiff to show that a reasonable jury could find that defendants' proffered reasons are pretextual and that the "job action was the result of the defendant[s]'[] retaliatory animus.'" Collazo, 617 F.3d at 46.

C.    Pretext

Evidence of pretext can be direct or circumstantial, and it can come in a wide variety of forms. Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 23 (1st Cir. 2010). Circumstantial evidence of pretext may include "evidence of differential treatment in the workplace, statistical evidence showing disparate treatment, temporal proximity of an employee's protected activity to an employer's adverse action, and comments by the employer which intimate a retaliatory mindset." See id. at 24.

Plaintiff provides a number of evidentiary proffers to show that defendants' stated reasons for the conduct that occurred

after he engaged in the protected activities were pretexts for retaliation.  First, plaintiff asserts that pretext exists because he received disparate treatment for engaging in the protected activities.  Plaintiff points to the fact that he received a written reprimand for not performing enough alignment audits while there is no evidence that other associates or managers at Burlington received any disciplinary measure for the same conduct.  Plaintiff was also terminated in large part for yelling at a customer while the complaint about an associate cursing at a customer and a store manager hanging up on the customer was handled by giving the customer a gift card without any further disciplinary action.  (Docket Entry # 29-84).

Moreover, the summary judgment record shows that Musto emailed Merrifield to coordinate efforts in holding plaintiff accountable for his actions and performance.  (Docket Entry # 29-68).  Soon after plaintiff contacted 88 Sears, Musto called 88Sears and filed a complaint against plaintiff.  (Docket Entry # 29-49).  In investigating plaintiff's complaint, Musto—who already had concerns about plaintiff's performance—conducted the investigation himself (Docket Entry, # 29-95, p. 6), notwithstanding Sears' policy that an investigation be impartial. (Docket Entry # 29-50).  Musto also refused to transfer plaintiff, stating "I feel we have an established case against [plaintiff] in Burlington and I do not want to allow him a

chance to start over again in a new store." (Docket Entry # 29-78).

In sum, plaintiff raises a genuine issue of fact as to whether defendants unlawfully retaliated against him for engaging in activities that are protected under chapter 151B and the FMLA. Based on defendants' comments and the disparate treatments plaintiff received, a jury could reasonably infer that defendants' proffered reasons are pretextual and that the adverse employment actions, including his termination, were the result of defendants' retaliatory animus. Counts II and III therefore survive summary judgment as well.

III.  Motion to Strike

Defendants move to strike certain portions of plaintiff's response to defendants' LR. 56.1 statement of undisputed facts as well as certain exhibits. (Docket Entry # 34). Defendants submit that they either are not supported by any record evidence or are only supported by evidence that is inadmissible hearsay.

The motion is moot as to plaintiff's exhibits 15 and 64 and paragraphs 32 to 36, 38, 41, 42, 74, 124, 143 and 150 of plaintiff's LR. 56.1 statement. This court did not consider these exhibits and paragraphs in its recommendation to deny summary judgment.

Defendants also move to strike portions of paragraphs 11, 13 and 40 of plaintiff's LR. 56.1 statement of undisputed facts.

As discussed above in footnotes two, three and eight, the challenged paragraphs are not inadmissible hearsay because paragraphs 11 and 13 were not considered for the truth of the matter asserted and paragraph 40 is admissible under 801(d)(2)(D).

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[20] that defendants' motion for summary judgment (Docket Entry # 24) be **DENIED**.  To the extent set forth above, the motion to strike (Docket Entry # 34) is **DENIED**.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[20]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Rule 72(b), Fed.R.Civ. P.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.